**FOR PUBLICATION**

# UNITED STATES COURT OF APPEALS FOR THE NINTH CIRCUIT

UNITED STATES OF AMERICA,
         *Plaintiff-Appellee,*

v.

EMILIO REYES-BOSQUE, aka Emilio
Varela, JOSE LUIS RAMIREZ-
ESQUEDA,

         *Defendants-Appellants.*

Nos. 08-50253;
08-50330

D.C. Nos.
3:05-cr-02239-
BEN-1;
3:05-cr-02239-
BEN-2

OPINION

Appeal from the United States District Court
for the Southern District of California
Roger T. Benitez, District Judge, Presiding

Argued and Submitted
November 3, 2009—Pasadena, California

Filed March 1, 2010

Before: Mary M. Schroeder, Eugene E. Siler, Jr.,* and
Sandra S. Ikuta, Circuit Judges.

Opinion by Judge Siler

---

*The Honorable Eugene E. Siler, Jr., Senior United States Circuit Judge
for the Sixth Circuit, sitting by designation.

**COUNSEL**

Holly A. Sullivan, of San Diego, California, argued the cause for defendant-appellant, Reyes-Bosque, and filed the briefs.

Timothy Allen Scott, of San Diego, California, argued the cause for defendant-appellant, Ramirez-Esqueda, and filed the briefs.

Andrew G. Schopler, Assistant United States Attorney for the Southern District of California, San Diego, California, argued the cause for the appellee and filed the brief. Karen P. Hewitt, United States Attorney for the Southern District of California, and Bruce R. Castetter, Assistant United States Attorney for the Southern District of California, were on the brief.

**OPINION**

SILER, Senior Circuit Judge:

Emilio Reyes-Bosque was convicted and sentenced to 210-months' imprisonment for (1) aiding aggravated felon aliens to enter the United States, in violation of 8 U.S.C. § 1327; (2) conspiracy to bring in, transport and harbor illegal aliens, in violation of 8 U.S.C. § 1324(a)(1)(A)(i), (ii), (iii), and (v)(I); (3) four counts of bringing in illegal aliens for financial gain ("brings to"), in violation of 8 U.S.C. § 1324(a)(2)(B)(ii); and (4) four counts of harboring illegal aliens, in violation of 8

U.S.C. § 1324(a)(1)(A)(iii) and (v)(II). Jose Luis Ramirez-Esqueda was convicted and sentenced to a term of 48 months for six counts of harboring illegal aliens, in violation of 8 U.S.C. § 1324(a)(1)(A)(iii) and (v)(II). Both defendants appeal the district court's denial of their individual motions to suppress evidence. Reyes-Bosque also challenges the sufficiency of the evidence to support his conviction, the admission of hearsay evidence at his trial, and the district court's denial of his motion for appointment of new counsel before his sentencing. We affirm.

## I. FACTUAL BACKGROUND

### A. Facts Leading to Discovery of Stash House

Martha Ramirez-Elizondo, her father Pedro Montejano-Quintero, Adolfo Villagomez-Alonso, and approximately eighteen other smuggled aliens were housed at 362 Wilson Street, Unit 4, a two-bedroom unit near Brawley, California. Ramirez-Esqueda and Angel Rivas-Pozos, a codefendant who has not appealed his conviction or sentence, watched over the aliens. The aliens were told not to leave the house and not to make any noise. On the morning of December 2, 2005, Ramirez-Elizondo, Montejano-Quintero, and Villagomez-Alonso slipped out of Unit 4 when one of the guards went into the bathroom. While leaving the house, they ran into Ramirez-Esqueda, who told them not to leave. Ramirez-Elizondo had taken a knife from the kitchen, which she kept visible when they met Ramirez-Esqueda. Although Ramirez-Esqueda told them not to leave, they ignored him and left anyway. They went into Brawley, which was about two miles from Unit 4.

Border Patrol Agents Felipe Rodriguez and Luis Martinez observed the three aliens and followed them to Garcia's Market. Martinez approached Montejano-Quintero and Villagomez-Alonso, and identified himself as a Border Patrol agent. Montejano-Quintero and Villagomez-Alonso walked

away from the agents and joined Ramirez-Elizondo inside Garcia's Market; the agents followed and asked them to come outside, where they asked to see their legal documents. After the aliens admitted that they did not have any documentation and that they were in the country illegally, the agents arrested them. When asked where they were coming from, Ramirez-Elizondo told the agents that they had escaped from a house a couple of miles away, and that one of the caretakers tried to prevent them from leaving. She told them that she had been there for a few days, was uncomfortable in the house, and did not know when she would get to leave. She also told the agents that there were approximately twenty more people in the house and offered to take the agents to the place where she had been held. Because Martinez knew that this particular block was dangerous, based on his knowledge that there had recently been a shootout in the area,[1] the agents called for backup before going into any of the units. While waiting for backup, Martinez and Rodriguez, who were dressed in plain clothes, put on bullet-proof vests. Ramirez-Elizondo identified the last unit, Unit 4, as the place where she was held. She also told the agents that she did not want to go inside, because she was afraid.

After fifteen to twenty minutes, backup agent Robert Perez arrived. The three agents saw Rivas-Pozos, whom Ramirez-Elizondo identified as the caretaker of the house where they were held. Martinez approached Rivas-Pozos, identified himself as a Border Patrol agent, and asked him to identify his citizenship. Rivas-Pozos stated that he was a United States citizen and gave Martinez his identification, which listed his residence as 362 Wilson Street. He told Martinez, however, that he lived in El Centro, California, and that he was visiting his godfather, Reyes, who lived at 362 Wilson Street, Unit 3. After this conversation, the agents split up. Perez went to Unit 3 to corroborate Rivas-Pozos's story, while Martinez and

---

[1]Some agents testified that it was their understanding that the shootout had occurred at this address.

Rodriguez went to Unit 4 to investigate the information Ramirez-Elizondo had provided. Units 3 and 4 are adjacent to each other, but are not adjoining.

## B. Initial Search of Units 3 and 4

Rodriguez went to the front door of Unit 4, while Martinez went around to the back. After Rodriguez knocked on the door and identified himself as a Border Patrol agent, Martinez observed someone popping his head out a back window, then quickly pulling it back into the unit. Martinez relayed what he saw to Rodriguez, who entered the unit through an unlocked front door with his weapon drawn, told everyone to get down, and identified himself. Martinez entered the unit moments later. The agents went through the unit, gathered all eighteen occupants, and questioned them regarding their citizenship. Martinez stayed with the occupants until transport arrived to take them to processing, which was between thirty and sixty minutes after they entered Unit 4. The agents also gathered documents in plain view, including ledgers, maps, and a list of rules for drivers signed by Emilio Varela, one of Reyes-Bosque's aliases.

While Martinez and Rodriguez investigated Unit 4, Perez accompanied Rivas-Pozos to Unit 3. When they arrived at Unit 3, Rivas-Pozos knocked on the door; after about a minute, Perez knocked, again receiving no answer. At some point, Perez said "Border Patrol, open the door," or words to that effect. After several minutes of knocking, Reyes-Bosque's wife Carmen Guzman-Tinoco opened the door. Perez told her that he was a Border Patrol agent and was trying to find out whether Rivas-Pozos's godfather lived there. Perez also asked her for her identification. Guzman-Tinoco produced a Mexican Border Card, but did not have immigration documents. After Perez asked to speak with her husband, Reyes-Bosque came to the door. He denied that Rivas-Pozos was his godson and claimed that he was just a friend. He presented valid identification and immigration documents to Perez.

With this information, Perez called dispatch to conduct a record check on Reyes-Bosque. Agent Leyba, who heard the call over the radio, transmitted that he had previous run-ins with Reyes-Bosque. Perez then told Reyes-Bosque that he was arresting his wife for failure to carry immigration documents. He informed Guzman-Tinoco, who had given birth days earlier, that she could take her baby with her or leave him with her sister. He also told her that if she was going to "get the baby's stuff," he would need to go in the house with her to check for weapons, for his safety. She decided to take the baby with her, and Perez accompanied her into the house.

Perez entered Unit 3 after Guzman-Tinoco and Reyes-Bosque told him no one was inside the house besides them, Guzman-Tinoco's sister, and her sister's children. Perez testified that Guzman-Tinoco went throughout the entire house in order to get the baby's items ready. During Perez's sweep of the house, he discovered Ramirez-Esqueda, fully dressed, and hiding underneath some covers on a bed. When Perez asked him to identify himself, he stated that he was Reyes-Bosque's friend. Ramirez-Esqueda produced a Mexican passport and a valid visa upon Perez's request. Perez also performed a record check on him, which revealed that he had been arrested by the Border Patrol for alien smuggling in 2001.

## C.   Ramirez-Esqueda's Confessions

At some point, Perez instructed Ramirez-Esqueda to sit in the living room while the Border Patrol agents processed the situation. At that time, there were five Border Patrol agents—Rodriguez, Martinez, Perez, Leyba, and Castro—and several Brawley Police officers on the grounds; Leyba and Castro showed up after the other agents had entered both units. Without informing Ramirez-Esqueda of the *Miranda* warnings, Perez and Castro had a brief conversation with Ramirez-Esqueda while he was sitting in the living room before Perez took him outside for further questioning. During that brief conversation, they inquired as to his citizenship, his reason for

being at the house, how he knew Reyes-Bosque, and whether he knew Rivas-Pozos. Ramirez-Esqueda stated that he was at the house to purchase a vehicle, although he could not state which one, and that he knew Rivas-Pozos. After taking him outside, Perez asked him about his prior arrest and about his reason for visiting the house. After Ramirez-Esqueda claimed simply to be visiting, Perez said, "You were caught for alien smuggling, just tell us the truth," and asked, "Are you smuggling again?" Ramirez-Esqueda stated that he was working for "him," presumed to mean Reyes-Bosque, and that he got paid $100 for scouting the checkpoints.

The defendants and the illegal immigrants found in Unit 4 were taken to the station. Castro and Leyba—neither of whom heard Ramirez-Esqueda confess on the scene—conducted a videotaped interview with Ramirez-Esqueda at the station. Before questioning him, Castro read him the *Miranda* warnings in Spanish. During this interview, Ramirez-Esqueda admitted that he was hired by Reyes-Bosque to scout the Border Patrol checkpoint on Highway 86. He further stated that he used a cellular phone that Reyes-Bosque gave him to report on the status of the checkpoint, so that Reyes-Bosque would know when to move people across the border.

## D.   Post-Indictment Activities[2]

After the search of the Wilson Street Property, the government indicted Reyes-Bosque, Ramirez-Esqueda, and Rivas-Pozos on six "brings to" counts and six "harboring" counts. Both Reyes-Bosque and Ramirez-Esqueda were released from custody after posting bail.

---

[2]Ramirez-Esqueda objects to references to some of the following facts, because they were not presented at his trial. To the extent we refer to him in the following sections, we do not consider the facts against him in our analysis of the legal issues.

### 1.  January 2006 Smuggling Activities

On January 30, 2006, a Jeep Cherokee containing one smuggled alien, Jesus Aguila-Sandoval, arrived at 362 Wilson Street. At Reyes-Bosque's trial, Aguila-Sandoval testified that Reyes-Bosque led him into Unit 4, where five other aliens were being held. The next morning, Reyes-Bosque told Aguila-Sandoval, "it was time," led him back to the Jeep Cherokee, driven by Juan Contreras-Duarte and containing three other smuggled aliens, and told him to get into the trunk of the Cherokee. Border Patrol agents were conducting surveillance on Reyes-Bosque's residence and also observed these activities. A Ford Explorer, which was also parked at 362 Wilson Street, pulled out of the driveway and Contreras-Duarte followed behind it in the Jeep Cherokee. Contreras-Duarte drove until he got to a dirt road a few miles before the Border Patrol checkpoint and pulled off the road. He had been in contact with Reyes-Bosque via cellular phones belonging to Reyes-Bosque. Agent Gamble, one of the Border Patrol agents conducting surveillance, approached Contreras-Duarte in the Cherokee after it stopped. While interviewing the vehicle's occupants and making arrests, he observed the cellular phone and heard someone contacting it using the direct-connect feature, asking "where are you," several times. Those messages were sent using a cellular phone seized from Reyes-Bosque's home.

### 2.  February 2006 Search

Border Patrol agents executed a search warrant for Units 3 and 4 on February 3, 2006. Some of the items seized in this search included: (1) a ledger listing payments for "brinco," which is slang for "jumping the border"; (2) the Nextel Blackberry cellular phone that was used during the January 31, 2006, event; (3) an invoice from Sprint indicating that Reyes-Bosque was the subscriber for both the Nextel Blackberry and the Motorola cellular phones, which were also used during the

January 31, 2006 event; and (4) a pay-and-owe-sheet listing smugglers who were owed money.

### 3.   Additional Smuggling Activity

Even after the February 2006 search, Reyes-Bosque and Ramirez-Esqueda continued their participation in smuggling activities. For example, a Ford F-150 truck that Ramirez-Esqueda ostensibly sold to Reyes-Bosque was stopped in December 2006 after a high-speed chase and contained at least eight illegal aliens. Additionally, in late December 2006, a few weeks after allegedly selling Reyes-Bosque a Ford Windstar, Ramirez-Esqueda obtained a new license plate for the vehicle and registered it in his own name. Three weeks later, Border Patrol agents stopped that vehicle for transporting four illegal aliens. Between May 2006 and January 2007, there were two other alien-smuggling arrests involving vehicles registered to either Ramirez-Esqueda or Reyes-Bosque.

## II.   Procedural Background

### A.   Pre-Trial

Reyes-Bosque, Ramirez-Esqueda, and Rivas-Pozos were each indicted in December 2005 on twelve counts: (1) six counts of "brings to," in violation of 8 U.S.C. § 1324(a)(2)(B)(ii); and (2) six counts of harboring illegal aliens, in violation of 8 U.S.C. § 1324(a)(1)(A)(iii) and (v)(II). In January 2006, Reyes-Bosque filed a motion to sever his case from that of his codefendants and a motion to suppress the evidence seized on December 2, 2005. In February 2006, Ramirez-Esqueda moved to suppress the evidence obtained on December 2, 2005; to suppress his confession and other statements; and to sever the cases of his codefendants. In April 2006, Reyes-Bosque filed a motion to suppress evidence seized during the February 2006 search.

The district court conducted evidentiary hearings over three days and denied both motions to suppress the evidence seized

during the December 2005 searches, including Ramirez-Esqueda's confessions. *United States v. Reyes-Bosque*, 463 F. Supp. 2d 1138, 1151 (S.D. Cal. 2006). The court later denied Reyes-Bosque's motion to suppress the evidence seized during the February 2006 search. It did, however, sever Reyes-Bosque's case. In January 2007, a grand jury returned a ten-count superceding indictment, charging Reyes-Bosque with the following: (1) aiding aggravated felon aliens to enter the United States, in violation of 8 U.S.C. § 1327; (2) conspiracy to bring in and harbor illegal aliens, in violation of 8 U.S.C. § 1324(a)(1)(A)(i), (ii), (iii) and (v)(I); (3) four counts of "brings to," in violation of 8 U.S.C. § 1324 (a)(2)(B)(ii); and (4) four counts of harboring illegal aliens, in violation of 8 U.S.C. § 1324(a)(1)(A)(iii) and (v)(II).

## B.   Ramirez-Esqueda's Conviction and Sentencing

In January 2007, Ramirez-Esqueda was convicted by a jury of all twelve counts in the original indictment. After we issued our opinion in *United States v. Lopez*, 484 F.3d 1186 (9th Cir. 2007) (en banc), however, the district court vacated the guilty verdicts on the "brings to" counts and ordered a new trial as to these counts. Ramirez-Esqueda moved for reconsideration of his motion to suppress, based on evidence that came out during trial, which the district court denied. In July 2008, Ramirez-Esqueda entered into a post-trial agreement, in which he stipulated to a sentence of 48 months on his remaining guilty counts, and the government agreed to dismiss the "brings to" counts. The court sentenced Ramirez-Esqueda to 48-months' imprisonment for each harboring count, to be served concurrently. Pursuant to the post-trial agreement, Ramirez-Esqueda waived his right to appeal or collaterally attack his conviction, with the exception of his right to appeal the denial of his motions to suppress.

## C.   Reyes-Bosque's Conviction and Sentencing

In February 2008, a jury convicted Reyes-Bosque of all counts in the superceding indictment. In May 2008, about ten

days before the original sentencing date, Reyes-Bosque orally moved for the court to appoint a new attorney to represent him. During the post-trial status hearing, the court stated that it doubted that Reyes-Bosque was indigent (although a magistrate judge had previously found him to be so), based on evidence it heard during trial regarding the money he made from alien smuggling. Siddell, Reyes-Bosque's attorney, encouraged the court to appoint counsel, arguing that "when there is a breakdown like this, . . . the court really should appoint [him] an attorney." The court conducted a sealed, *ex parte* hearing with Reyes-Bosque regarding his motion.

During his conversation with the court, Reyes-Bosque stated that he told Siddell that he wanted to testify, but that Siddell would not allow him to do so, and that Siddell did not call witnesses that he thought he should have called. Two of the witnesses at issue were Reyes-Bosque's mother and brother, although he could not tell the court what they would have testified to if they had been called. He also claimed that there were two witnesses who were in his house on February 2, 2006, who would testify that immigration officers broke in and started shooting two hours before other officers appeared with a search warrant. He also claimed that Siddell never visited him during the trial so that he could tell him how he thought the jury was being misled. In response to these allegations, Siddell stated that he spoke with Reyes-Bosque's mother and brother, and that they both stated unequivocally that they did not want to testify. He told Reyes-Bosque that he preferred not to force witnesses to testify if they were hostile, particularly when their testimony could be replaced by other evidence. He further stated that he advised Reyes-Bosque not to testify because, if he were convicted, his testimony could be considered obstruction under the Sentencing Guidelines and could be used to increase his sentence. Siddell claimed that Reyes-Bosque accepted that advice, but after the verdict, declared he wanted to testify. After the court's conversation with Reyes-Bosque and Siddell, it concluded that he

was entitled to fire Siddell, but that he would have to hire his own attorney, and that one would not be appointed for him.

Reyes-Bosque did not object to his pre-sentence report. Siddell filed a sentencing memorandum agreeing with probation's calculations of a base offense level of 43, and also agreed that nothing supported a downward adjustment. At sentencing, Siddell repeatedly expressed further reluctance in representing Reyes. Nonetheless, Reyes-Bosque was sentenced to a term of 210 months.

## III.  DISCUSSION

### A.  Search of Unit 3

[1] Ramirez-Esqueda and Reyes-Bosque both challenge the validity of the December 2005 search of Unit 3 on Fourth Amendment grounds. Although the government does not dispute Reyes-Bosque's standing, it does argue that Ramirez-Esqueda does not have standing to challenge the search of Unit 3. We review the question of whether a defendant has standing to assert a Fourth Amendment claim de novo, although we review the underlying facts for clear error. *United States v. Decoud*, 456 F.3d 996, 1007 (9th Cir. 2006); *see also United States v. Davis*, 932 F.2d 752, 756 (9th Cir. 1991). To claim the protections of the Fourth Amendment, defendants must demonstrate that they had an expectation of privacy in the property searched and that their expectation was reasonable. *United States v. Silva*, 247 F.3d 1051, 1055 (9th Cir. 2001) (citing *Minnesota v. Carter*, 525 U.S. 83, 88 (1998)). The burden is on the defendants to "establish[ ] that, under the totality of the circumstances, the search or the seizure violated their legitimate expectation of privacy." *Id.*

Ramirez-Esqueda argues that he has standing to challenge the search of Unit 3, because he was an overnight guest at Unit 3.[3] *See Minnesota v. Olson*, 495 U.S. 91, 96-97 (1990)

_____

[3]Although the government did not raise the issue of standing before the district court, we may consider it now. *See United States v. Paopao*, 469

("[Defendant's] status as an overnight guest is alone enough to show that he had an expectation of privacy in the home that society is prepared to recognize as reasonable."). In support of this argument, the only evidence that Ramirez-Esqueda presents is his statement that he was at the house "to rest" and "to stay overnight." The government argues, however, that Ramirez-Esqueda was not an overnight guest, and was simply at Unit 3 because Reyes-Bosque paid him to be there. *See Minnesota v. Carter*, 525 U.S. 83, 90-91 (1998) (holding that defendants were not overnight guests but were at the home for a "purely commercial purpose" for which there was no legitimate expectation of privacy, where they were at the home to assist in drug packaging, had only been there for two-and-one-half hours, and had no previous connection with the owner).

**[2]** Ramirez-Esqueda's "bald assertion that he was an overnight guest . . . is not sufficient to establish that he had a legitimate expectation of privacy in [Unit 3]." *United States v. Armenta*, 69 F.3d 304, 308 (9th Cir. 1995). In *Armenta*, we concluded that the defendant had not sufficiently demon-

F.3d 760, 764 (9th Cir. 2006); *United States v. Taketa*, 923 F.2d 665, 670 (9th Cir. 1991) (distinguishing our prior cases holding that the government could not raise Fourth Amendment standing for the first time on appeal from those that allowed the government to raise the issue, on the grounds that the former were cases in which the government appealed motions to suppress that had been granted by the district court, whereas the latter were cases in which the defendant appealed the district court's denial of a suppression motion); *United States v. Robertson*, 833 F.2d 777, 779 (9th Cir. 1987) (explaining that when a defendant challenges the denial of a motion to suppress, "he must show standing even if the government has not pressed the issue in the district court"). So long as the government did not rely on facts contrary to its standing argument before the district court, the standing issue is properly before us on appeal. *Taketa*, 923 F.2d at 670. Accordingly, it is proper for us to consider whether Ramirez-Esqueda has standing to challenge the search of Unit 4, because he is appealing the district court's denial of his motion to suppress and the government has not "assent[ed] to contrary findings of fact." *Id.*

strated that he was an overnight guest in the house searched, even though he had presented the following evidence: his affidavit; the arresting officer's testimony; the fact that his wallet, baptismal certificate, and social security card application were found in the house; and his attorney's statement that a third party—who did not have any apparent ownership or control over the house—would testify that he was a guest there and was free to come and go as he pleased. *Id.* Ramirez-Esqueda has presented even less evidence than the defendant in *Armenta*. Although Ramirez-Esqueda contends that his presence as an overnight guest is an undisputed fact, we disagree. The only evidence to support that fact was his own statement. There is no evidence that he had personal items with him to suggest that he was staying the night, had a key to Unit 3, stored items at the unit, or was free to come and go as he pleased. *See id.* (distinguishing *Davis*, 932 F.2d at 756, and other similar cases, which held that the defendant had proven his status as an overnight guest). Reyes-Bosque also never stated that he had given Ramirez-Esqueda permission to stay at Unit 3 as an overnight guest. In fact, the evidence presented indicates that Ramirez-Esqueda was not an overnight guest, but was instead at Unit 3 because he was working for Reyes-Bosque. Ramirez-Esqueda admitted that he had been scouting checkpoints for Reyes,[4] and the evidence shows he had been scouting on the night before the search. He likely did not return to Unit 3 until well after midnight on the morning of the search. He was also seen outside of Unit 3 around 8:30 or 9:00 a.m. on the morning of the search, rather than inside resting, as he claimed. Additionally, when Perez found Ramirez-Esqueda, he was fully dressed and hiding under covers on a bed. These facts suggest that Ramirez-Esqueda was not an overnight guest.

**[3]** This case is also distinguishable from *United States v. Gamez-Orduño*, 235 F.3d 453 (9th Cir. 2000), in which we

---

[4]As we discuss later, the district court did not err in admitting his confession.

held that "[r]esting in a home made available without charge by an identifiable occupant is not commercial activity . . . no matter why the guests are away from home and in need of shelter." *Id.* at 459. The evidence presented in *Gamez-Orduño* showed that the defendants were overnight guests in the place searched. *Id.* ("The record shows that appellants were overnight guests in the trailer, and that they were there for rest and food, not simply to do business." (internal quotations and omissions omitted)). However, the evidence in the record here does not similarly demonstrate that Ramirez-Esqueda was an overnight guest. Because Ramirez-Esqueda has not presented sufficient evidence to prove that he was an overnight guest at Unit 3 and has not argued that he has standing to challenge the search on any other grounds, we conclude that he does not have standing to challenge the search of Unit 3.

Although Reyes-Bosque does have standing to challenge the search of Unit 3, we decline to reach the issue of whether the search violated the Fourth Amendment. No tangible evidence was seized from Unit 3 during the December 2005 search, and none of the statements made by Ramirez-Esqueda or Reyes-Bosque's wife as a result of the search was admitted into evidence in Reyes-Bosque's trial or used to establish probable cause for the subsequent search.

## B. Search of Unit 4

In addressing whether the search of Unit 4 violated Reyes-Bosque's Fourth Amendment rights, the district court concluded that he did not have standing to challenge the search, *Reyes-Bosque*, 463 F. Supp. 2d at 1143-44, and alternatively concluded that exigent circumstances justified the search, *id.* at 1144. We affirm the district court's holding with regard to both conclusions.

### 1. Standing

Reyes-Bosque asserts that he has standing to challenge the search of Unit 4, because he paid rent for Unit 4 during the

time of the search, had an electric bill for Unit 4 in his residence, which was found during the February 2006 search, and had joint control over Unit 4. Reyes-Bosque began paying rent on Unit 4 in December 2004 and was still giving the landlord the rent for the unit at the time it was searched. Beginning in September 2005—three months before the search—however, Reyes-Bosque was no longer listed as the payor for Unit 4 and the rental receipts were made out to Juan Contreras. Additionally, the electric bill for Unit 4, which was found in Reyes-Bosque's residence, did not list Reyes-Bosque as the customer on the bill. This evidence is not sufficient to show that Reyes-Bosque had joint control over Unit 4.

In *United States v. Johns*, 851 F.2d 1131 (9th Cir. 1988), we held that a defendant has a reasonable expectation in property searched if he can demonstrate a "formalized, ongoing arrangement . . . that indicates joint control" over the place searched. *Id.* at 1136 (internal quotations and citations omitted); *see also United States v. Pollock*, 726 F.2d 1456, 1465 (9th Cir. 1984) (concluding that a defendant had standing to challenge the search of a residence that he used, with the permission of the owner, to manufacture methamphetamine). Similarly, in *Davis*, we held that the defendant had a legitimate expectation of privacy in a friend's apartment based on evidence that he had a key to the apartment, had permission to "come and go as he pleased," stored items in the apartment and had an ongoing obligation to pay a portion of the rent. 932 F.3d at 757.

**[4]** Comparatively, in *United States v. Sarkisian*, 197 F.3d 966 (9th Cir. 1999), we held that the defendants lacked standing to challenge the search of a commercial storage unit even though they were included on the list of people allowed access to the unit, because they did not use the unit, did not assert ownership over any of the items seized, and produced no evidence that they paid any part of the rental fee for the unit. *Id.* at 987-88. Similarly, in *United States v. Aguirre*, 839 F.2d 854 (1st Cir. 1988), *affirmatively cited in Sarkisian*, 197

F.3d at 987, the First Circuit refused to extend standing to challenge a search of an apartment to a defendant who had not presented any evidence that he owned, leased, or resided in the apartment, kept personal items there, had excluded others from using the property, or that he had any interest in the items seized. *Id.* at 859. The fact that Aguirre possessed keys to the apartment was not enough to establish standing. *Id.*

**[5]** Likewise, Reyes-Bosque cites no evidence to support his contention that he had joint control over Unit 4. He never claims that he resided in Unit 4, used Unit 4 for any purpose, or even had access to Unit 4. Instead, he relies primarily on the fact that he "paid" the rent for Unit 4, despite the fact that for three months prior to the search, the monthly receipts listed Contreras-Duarte as the payor. The fact that Reyes-Bosque physically gave the landlord the rent payment is insufficient to establish that he had a legitimate expectation of privacy in Unit 4. Accordingly, he does not have standing to challenge the search of Unit 4.

## 2.  Exigent Circumstances Doctrine

**[6]** Even if Reyes-Bosque had standing to challenge the December 2005 search of Unit 4, however, the search was justified by the exigent circumstances doctrine. In order to prove that the exigent circumstances doctrine justified a warrantless search, the government must show that: "(1) considering the totality of the circumstances, law enforcement had an objectively reasonable basis for concluding that there was an immediate need to protect others or themselves from serious harm; and (2) the search's scope and manner were reasonable to meet the need." *United States v. Snipe*, 515 F.3d 947, 952 (9th Cir. 2008); *see also Brigham City, Utah v. Stuart*, 547 U.S. 398, 404-06 (2006).

**[7]** In this case, the agents had an objectively reasonable basis for believing that there was an immediate need to protect the individuals in Unit 4. "In determining whether such

an entry is objectively reasonable, the Supreme Court has 'consistently eschewed bright-line rules, instead emphasizing the fact-specific nature of the reasonableness inquiry,' and looked to the totality of the circumstances." *Snipe*, 515 F.3d at 953 (quoting *Ohio v. Robinette*, 519 U.S. 33, 39 (1996)). Considering the totality of the circumstances, Rodriguez and Martinez knew that three illegal aliens had escaped from Unit 4 after being held there for a few days. They also knew that approximately twenty more illegal aliens were being held in the house, and had been instructed not to leave. Additionally, after Rodriguez knocked on the door, Martinez saw someone attempting to escape from the house, adding to the officer's suspicion that there was an emergency situation inside the house. Based on this information, the agents had an objectively reasonable basis for believing that entry into Unit 4 was required to protect others in the unit. Even if they subjectively desired to enter Unit 4 for the purpose of seizing evidence of alien smuggling, we consider the reasonableness of their actions based on an objective standard. *Brigham*, 547 U.S. at 404 ("The officer's subjective motivation is irrelevant.").

Likewise, the scope and manner of the search was reasonable. Before entering, the agents knocked and announced their presence. Although the agents entered with their guns drawn, they immediately put them away and began securing the individuals inside the house. Given the number of people inside Unit 4, it was reasonable for the agents to search each room of the house. Because the agents had an objectively reasonable basis for believing that there was an immediate need to enter Unit 4 for the protection of possible victims, and because they conducted the search in a reasonable manner, the evidence they discovered is admissible. *Brigham*, 547 U.S. at 406-07; *Snipe*, 515 F.3d at 952.

Finally, the fact that the agents waited for backup before entering Unit 4 does not negate their reliance on an emergency justification. "[T]he critical time for determining whether any exigency exists is the moment the officer makes

the warrantless entry." *United States v. Johnson*, 256 F.3d 895, 907 (9th Cir. 2001) (per curiam) (en banc). We have previously held that officers should obtain a search warrant if time permits. *See Michigan v. Tyler*, 436 U.S. 499, 509 (1978) ("Our decisions have recognized that a warrantless entry by criminal law enforcement officials may be legal when there is compelling need for official action and no time to secure a warrant."); *Fisher v. City of San Jose*, 509 F.3d 952, 960-61 (9th Cir. 2007); *United States v. Reid*, 226 F.3d 1020, 1028 (9th Cir. 2000). However, if there is insufficient time to obtain a search warrant, officers can enter the premises, even if they have waited for backup. *See United States v. Lindsey*, 877 F.2d 777, 781-82 (9th Cir. 1989) (exigent circumstances still present after officers waited an hour for backup to arrive in order to enter a home to conduct a warrantless search for explosives); *cf. Fisher*, 509 F.3d at 962 (no exigent circumstances because no officer attempted to get a warrant during twelve-hour standoff).

**[8]** Given the circumstances and what the agents knew in this case, the exigent circumstances doctrine justifies their search. The officers waited only fifteen to twenty minutes for backup, less than the amount of time found reasonable in *Lindsey*. 877 F.2d at 781-82. Moreover, the circumstances did not change in the twenty minutes while the officers waited and donned protective gear, so there was no indication that the emergency had dissipated. *See id.* at 782 ("[T]he delay did not dissipate the exigency. The source remained in possession of dangerous explosives . . . ."). When Agent Perez did arrive, the three agents moved quickly to search the premises and secure the illegal immigrants. *See id.* Nor would it have been practical for the officers to obtain a warrant during the time they waited for backup: while we strongly encourage officers to obtain a warrant before searching a home, *see Fisher*, 509 F.3d at 958, we have also recognized that obtaining a warrant is not a simple procedure that can be accomplished in under an hour, let alone twenty minutes, *see Lindsey*, 877 F.2d at 782. Accordingly, the district court properly concluded that

the search of Unit 4 was justified by the exigent circumstances doctrine, and that the evidence found during the search was admissible. Furthermore, the magistrate properly relied on evidence seized from that unit in issuing the warrant for the February 2006 searches.

## C.  Ramirez-Esqueda's Statements

We now consider Ramirez-Esqueda's argument that the district court erroneously denied his motion to suppress both of his confessions on the grounds that he was not given the *Miranda* warnings to which he was entitled before his first alleged confession, which also tainted his second, videotaped confession. The district court concluded that because Ramirez-Esqueda was not in custody when he first confessed to Perez, there was no *Miranda* violation. "A district court's 'in custody' determination is a 'mixed question of law and fact warranting de novo review.' " *United States v. Bassignani*, 575 F.3d 879, 883 (9th Cir. 2009) (quoting *United States v. Kim*, 292 F.3d 969, 973 (9th Cir. 2002)). However, because the district court properly admitted Ramirez-Esqueda's second confession and any improper admission of the first statement was harmless error, we need not decide whether he was in custody at the time of his first confession.[5]

**[9]** In *Miranda v. Arizona*, 384 U.S. 436 (1966), the Supreme Court adopted prophylactic procedural measures—the requirement that officers give the four *Miranda* warnings—to ensure a suspect is apprised of his Fifth Amendment rights before custodial interrogations. *Id.* at 444-45. Although a failure to issue the *Miranda* warnings to a suspect who is in custody typically makes any statement made by the suspect

---

[5]Ramirez-Esqueda also argues that we should suppress his statements as "fruit of the poisonous tree" resulting from the illegal entry into Unit 3. But as discussed in part III.A, *supra*, Ramirez-Esqueda does not have standing to challenge this search, and therefore cannot make the "fruit of the poisonous tree" argument.

inadmissible, the Supreme Court has twice addressed the admissibility of a confession obtained after the *Miranda* warnings, but preceded by an earlier, unwarned confession. In *Oregon v. Elstad*, 470 U.S. 298 (1985), the Court held that a "suspect who has once responded to unwarned yet uncoercive questioning is not thereby disabled from waiving his rights and confessing after he has been given the requisite *Miranda* warnings." *Id.* at 318. However, in *Missouri v. Seibert*, 542 U.S. 600 (2004), a plurality opinion, the Court distinguished *Elstad*, and concluded that "when interrogators question first and warn later," the issue "is thus whether it would be reasonable to find that in these circumstances the warnings could function 'effectively' as *Miranda* requires. Could the warnings effectively advise the suspect that he had a real choice about giving an admissible statement at that juncture?" *Id.* at 611-12.

**[10]** In *United States v. Williams*, 435 F.3d 1148 (9th Cir. 2006), however, we interpreted the holding in *Seibert* to be the narrower holding reached by Justice Kennedy. *Id.* at 1157-58 (citing *Marks v. United States*, 430 U.S. 188, 193 (1977)). Thus, where officers deliberately use a two-step interrogation technique in which they elicit an unwarned confession, administer the *Miranda* warnings and obtain a waiver of *Miranda* rights, then elicit a repeated confession, "the district court must suppress post-warnings statements unless the interrogators take curative measures to apprise the defendant of his rights." *United States v. Narvaez-Gomez*, 489 F.3d 970, 974 (9th Cir. 2007) (citing *Seibert*, 542 U.S. at 622; *Williams*, 435 F.3d at 1157-58). If the use of the two-step method is not deliberate, however, the post-warning statements are admissible if they were voluntarily made. *Id.*

**[11]** Ramirez-Esqueda never contends that the officers deliberately used the two-step method or that his post-warnings statements were involuntary. Instead, he argues that even if we conclude that the first, but not the second, confession should have been excluded, we must reverse his convic-

tion because the error was not harmless. We disagree. In *Arizona v. Fulminante*, 499 U.S. 279 (1991), a case upon which Ramirez-Esqueda relies for this argument, the Supreme Court declined to find that the admission of one of the defendant's two confessions was harmless error because "the transcript disclose[d] that both the trial court and the State recognized that a successful prosecution depended on the jury believing the two confessions." *Id.* at 297. This is not the case here. The evidence supported Ramirez-Esqueda's conviction, even without his first confession. As noted by Ramirez-Esqueda, the jury seemed to rely heavily on his subsequent, taped confession, evidenced by the fact that they sought and received permission to view the tape during deliberations. Because there is nothing to suggest that the officers deliberately used the two-step method or that his post-warning statement was not made voluntarily, the court properly admitted his second confession. Moreover, even if the district court erred in admitting his first statement, the error was harmless, because the other evidence presented against him was sufficient to support the jury's finding of guilt.

## D. Admission of Hearsay Testimony

Reyes-Bosque also argues that his conviction should be reversed because the trial court improperly admitted hearsay statements in violation of his Sixth Amendment rights. Specifically, Reyes-Bosque argues that the following testimony should have been excluded: (1) Border Patrol Agent Robert Nila's testimony that the driver he pulled over on January 17, 2005, on suspicion of alien smuggling, told him his name and that he was a United States citizen, that his four passengers were Mexican citizens, and that they were headed toward 362 Wilson Street; (2) Agent Castro's testimony that he encountered people, including Rivas-Pozos, at Unit 4 on January 7, 2006, that undocumented aliens were inside, that they told Agent Castro their names, that one of them was an illegal alien, and that another later said that the aliens belonged to Reyes; (3) Agent Gamble's testimony that the driver of a Jeep

Cherokee which Gamble detained after it left 362 Wilson Street on January 31, 2006, stated his own name and said the passengers of the car were Mexican citizens without documentation[6]; (4) Agent Brewer's testimony that when he stopped a vehicle, which was registered to Reyes-Bosque, on November 5, 2005, the driver stated that he had picked up passengers from the side of the road; and (5) Agent Reece's testimony that the driver of a minivan stopped on January 19, 2007, stated his own name.

Reyes-Bosque did not object to the challenged testimony at trial. Accordingly, we review the admission of this evidence for plain error. *United States v. Hagege*, 437 F.3d 943, 956 (9th Cir. 2006). To show plain error, Reyes-Bosque must show that there was: "(1) error; (2) that is plain; and (3) that affects substantial rights." *United States v. Rodriguez-Lara*, 421 F.3d 932, 948 (9th Cir. 2005). Finally, if he meets those three conditions, we may then exercise our discretion to notice a forfeited error, but only if (4) the error "seriously affects the fairness, integrity, or public reputation of judicial proceedings." *Id.*

**[12]** Even assuming Reyes-Bosque met the first three conditions, he has not shown that the error "seriously affect[ed] the fairness, integrity, or public reputation of judicial proceedings." *Id.* He complains of testimony regarding five instances in which agents questioned people regarding alien smuggling that may have been connected to him. Agent Reece's testimony that someone in a minivan told him his name did not connect Reyes-Bosque to alien smuggling. Similarly, Agent Gamble's testimony did not affect the fairness or integrity of judicial proceedings, because his testimony was cumulative. Aguila-Sandoval, one of the illegal aliens found in the vehicle Agent Gamble stopped, testified as to the same facts, admitted that he was an illegal alien, and that Reyes-Bosque played a

---

[6]One of the passengers did testify and additional evidence, including phone records, was admitted, corroborating Gamble's testimony.

role in his transportation to the United States. Although the remaining testimony was not specifically corroborated and the aliens stopped in those instances were not cross-examined, given the abundance of evidence presented by the government,[7] we cannot find that the court's error "seriously affect[ed] the fairness, integrity, or public reputation of judicial proceedings." *Rodriguez-Lara*, 421 F.3d at 948.

## E. Reyes-Bosque's Motion for Appointment of New Counsel

We now consider Reyes-Bosque's argument that the district court erred when it denied his motion for appointment of substitute counsel, thus depriving him of his Sixth Amendment right to counsel. We review a district court's denial of a motion for substitution of counsel for abuse of discretion. *United States v. Smith*, 282 F.3d 758, 764 (9th Cir. 2002); *United States v. Adelzo-Gonzalez*, 268 F.3d 772, 777 (9th Cir. 2001). In reviewing such a motion, we consider three factors: (1) the adequacy of the district court's inquiry; (2) the extent of the conflict between the defendant and counsel; and (3) the timeliness of defendant's motion. *See, e.g.*, *Daniels v. Woodford*, 428 F.3d 1181, 1197-98 (9th Cir. 2005); *Smith*, 282 F.3d at 764; *Adelzo-Gonzalez*, 268 F.3d at 777.

### 1. Adequacy of the Inquiry

[13] "Before ruling on a motion to substitute counsel due to an irreconcilable conflict, a district court must conduct 'such necessary inquiry as might ease the defendant's dissatisfaction, distrust, and concern.' " *Adelzo-Gonzalez*, 282 F.3d at 777 (citing *United States v. Garcia*, 924 F.2d 925, 926 (9th Cir. 1991)). This inquiry must give the court "a sufficient basis for reaching an informed decision." *United States v.*

---

[7]For example, the government presented physical evidence including ledgers, cellular phone receipts, eye witness identifications, and Reyes-Bosque's own admissions that he was involved in alien smuggling.

*McClendon*, 782 F.2d 785, 789 (9th Cir. 1986), *overruled on other grounds by United States v. Garrett*, 179 F.3d 1143 (9th Cir. 1999)). The district court should inquire into, *inter alia*, (1) how long a continuance new counsel would require, if any; (2) how much inconvenience would result from the substitution; (3) how much the breakdown in communication prevented adequate preparation; and (4) why the defendant did not make the motion earlier, if the motion was late. *United States v. D'Amore*, 56 F.3d 1202, 1205 (9th Cir. 1995), *overruled on other grounds by Garrett*, 179 F.3d 1143.

**[14]** More than two months after his conviction, Reyes-Bosque sent a letter to the court, stating that there was a breakdown in communications with Siddell and requesting the court appoint new counsel for sentencing. At a status hearing addressing Reyes-Bosque's request, the court questioned Reyes-Bosque about the conflict during a sealed, *ex parte* proceeding. Reyes-Bosque cites *Adelzo-Gonzalez* and argues that the court's inquiry was inadequate because it was a brief, open-ended inquiry, and that a more thorough inquiry should have been conducted. In *Adelzo-Gonzalez*, we explained that "[w]hile open-ended questions are not always inadequate, in most circumstances a court can only ascertain the extent of a breakdown in communication by asking specific and targeted questions." 268 F.3d at 778. Such specific questions were necessary in *Adelzo-Gonzalez* because there were obvious signs of discord between the defendant and his counsel: the defendant told the court that he and appointed counsel were not getting along and that he did not pay attention to him; appointed counsel also openly called the defendant a liar before the court and even threatened " 'to sink [him] for 105 years so that [he] wouldn't be able to see [his] wife and children.' " *Id.* Given that evidence of a serious conflict, we held that the court's inquiry, which focused on counsel's competency and ability to provide adequate representation in the future, did not provide a sufficient basis for determining the extent of the breakdown. *Id.*

**[15]** The same cannot be said of the district court's inquiry here. First, although Reyes-Bosque stated that he was not satisfied with his representation, there were no signs of antagonism or serious breakdown to suggest that the court needed to inquire more thoroughly than it did. While questioning Reyes-Bosque about why he wanted new counsel, it became obvious to the court that the breakdown was caused by the fact that Reyes-Bosque was simply unhappy with Siddell's performance and the fact that he was convicted. When Reyes-Bosque gave additional reasons for substitution—namely that counsel prevented him from testifying and did not call certain witnesses to the stand—the court asked specific follow-up questions to determine the extent of the conflict. The district court also questioned Siddell. We therefore hold that the district court's inquiry gave it a "sufficient basis for reaching an informed decision." *McClendon*, 782 F.2d at 789. In fact, Reyes-Bosque has not demonstrated what additional information would have been discovered had it inquired further.

## 2.  Extent of the Conflict

**[16]** Reyes-Bosque's conflict with Siddell centered on the fact that he was unhappy with counsel's performance. In his letter, he was concerned that Siddell was ineffective because "[n]ever were search issues presented, warrant issues or even basic 'habeas corpses' [sic] presented." Additionally, during the in-court inquiry, Reyes-Bosque complained that Siddell prevented him from testifying and did not call witnesses he thought could help his case. As we have said before, "[l]itigation tactics are decisions generally left to defense counsel," and, without more, may not provide a sufficient basis for establishing conflict. *See Smith*, 282 F.3d at 763. There was no evidence that the conflict was so extensive that it prevented Reyes-Bosque from communicating with Siddell—Reyes-Bosque and Siddell were still speaking and met for the probation interview and to prepare for sentencing. Thus, this factor weighs in favor of affirming the district court's denial.

### 3. Timeliness of Motion

**[17]** Reyes-Bosque waited over two months after his conviction to request a new attorney for sentencing. Although the district court did not inquire into the amount of time that would have been necessary for new counsel to prepare, given the extent of this case, it is fair to assume that granting defendant's motion ten days before sentencing was to occur would have required a substantial continuance. In considering a defendant's request to hire substitute counsel, we recognize that "even when the motion is made on the day of trial, the court must make a balancing determination, carefully weighing the resulting inconvenience and delay against the defendant's important constitutional right to counsel of his choice." *D'Amore*, 56 F.3d at 1207. Nonetheless, Reyes-Bosque's delay supports the district court's denial of his motion.

Under these circumstances, the district court properly exercised its discretion when it rejected Reyes-Bosque's motion for substitution of counsel.

### F. Sufficiency of the Evidence to Prove Reyes-Bosque's Guilt

Finally, Reyes-Bosque argues that the district court should have entered a judgment of acquittal because there was insufficient evidence to support his conviction that he aided and abetted the bringing in of aliens for financial gain, in violation of 8 U.S.C. § 1324(a)(2). We review challenges to the sufficiency of the evidence by determining "whether, after viewing the evidence in the light most favorable to the prosecution, *any* rational trier of fact could have found the essential elements of the crime beyond a reasonable doubt." *Jackson v. Virginia*, 443 U.S. 307, 319 (1979); *United States v. Lazarenko*, 564 F.3d 1026, 1035 (9th Cir. 2009).

**[18]** Section 1324(a)(2) makes it unlawful for any person to—

knowing[ly] or in reckless disregard of the fact that an alien has not received prior official authorization to come to, enter, or reside in the United States, bring[ ] to or attempt[ ] to bring to the United States in any manner whatsoever, such alien, regardless of any official action which may later be taken with respect to such alien.

8 U.S.C. § 1324(a)(2). In *United States v. Lopez*, 484 F.3d 1186 (9th Cir. 2007) (en banc), we held that a "brings to" offense under § 1324(a)(2) "terminates when the initial transporter drops the aliens off at a location in the United States." *Id.* at 1194. We further explained, however, that one can aid and abet a "brings to" offense from within the United States alone. *Id.* at 1199; *see also United States v. Hernandez-Orellana*, 539 F.3d 994, 1004 (9th Cir. 2008). "A financier who organizes and funds a smuggling operation, for example, whether located in or outside of the United States, may be said to have associated himself with the venture, participated in it as in something he wished to bring about, and sought by his action to make it succeed." *Lopez*, 484 F.3d at 1199 (internal quotations and alterations omitted).

In *Lopez*, we explained that "[t]he mere act of picking up aliens at a location near the border and transporting them within the United States is not sufficient to support a conviction for aiding and abetting a 'brings to' offense." *Id.* at 1199-1200. Additionally, the government would have to show more than "the fact that following completion of the 'brings to' offense [the defendant] twice spoke to a person who may have been the transporter." *Id.* at 1200. Similarly, in *Hernandez-Orellana*, we held that defendants' convictions for aiding and abetting a "brings to" offense were not sufficiently supported by the evidence even where the government introduced a ledger showing money owed and identifying which aliens the defendants were responsible for transporting or for making transportation arrangements and a journal identifying other aliens, names of foot guides, smugglers and drivers. 539 F.3d

at 1006. That evidence "establishe[d] no explicit extra-territorial connection as *Lopez* requires. *Id.* at 1005. Comparatively, in *United States v. Singh*, 532 F.3d 1053 (9th Cir. 2008), on plain error review, we affirmed a defendant's conviction of aiding and abetting a "brings to" offense, where the government presented evidence that the defendant picked up an illegal alien who had already entered the country via Vancouver, accompanied her to New York, and agreed ahead of time to return the passport the alien used to Vancouver. *Id.* at 1058-59.

**[19]** The evidence here sufficiently demonstrates that Reyes-Bosque was connected to conduct that occurred before the entry of illegal aliens to the United States. Although a plethora of evidence connected him to alien smuggling activities, including the fact that Reyes-Bosque provided cell phones, cars, and a place to keep the illegal immigrants (Unit 4), the key evidence to connect him to conduct that occurred before the "brings to" offense was complete is found in Villagomez-Alonso's testimony. Villagomez-Alonso testified that the person he negotiated with crossed into the United States with him, accompanied him and about twenty to twenty-five others to a house where they stayed for approximately four hours, and then took him to Unit 4. Under *Lopez*, the offense "ends when the person who transports the aliens to the country terminates his act of transportation and drops off the aliens in the United States." 484 F.3d at 1191. Here, the person who transported Villagomez-Alonso into the United States transported him to the first house, but did not drop him off. Instead, they continued on to Unit 4.[8] The government also presented a ledger obtained from Unit 4 with

---

[8]Reyes-Bosque argues that "[w]hat he doesn't describe, and what's [sic] he's not asked, is if the person who negotiated to cross him into the United States is the same person as the foot guide and/or the person who transported him in the United States." We disagree. Villagomez-Alonso clearly testified that he negotiated with "Person 1," that "Person 1" crossed with him into the United States, and that "Person 1" took him to the first house, then to Unit 4.

Villagomez-Alonso's name on it, thereby linking Reyes-Bosque's involvement in the smuggling operation to the cross-border transportation of Villagomez-Alonso. *See Hernandez-Orellana*, 539 F.3d at 1006.

[20] This evidence connects Reyes-Bosque to activities that occurred *before* "the person who transport[ed] the aliens to the country terminate[d] his act of transportation and drop[ped] off the aliens." *Lopez*, 484 F.3d at 1191. Accordingly, Reyes-Bosque's conviction was sufficiently supported by the evidence.

**AFFIRMED.**