**FOR PUBLICATION**

# UNITED STATES COURT OF APPEALS
# FOR THE NINTH CIRCUIT

UNITED STATES OF AMERICA,
*Plaintiff-Appellee*,

v.

GUADALUPE VELAZQUEZ,
*Defendant-Appellant.*

No. 14-10311

D.C. No.
2:12-cr-00877-
JAT-4

OPINION

Appeal from the United States District Court
for the District of Arizona
James A. Teilborg, Senior District Judge, Presiding

Argued and Submitted November 18, 2016
San Francisco, California

Filed May 1, 2017

Before: Alex Kozinski, Ronald Lee Gilman,[*] and
Michelle T. Friedland, Circuit Judges.

Opinion by Judge Friedland;
Concurrence by Judge Kozinski

---

[*] The Honorable Ronald Lee Gilman, United States Circuit Judge for the U.S. Court of Appeals for the Sixth Circuit, sitting by designation.

## SUMMARY[**]

### Criminal Law

The panel vacated the defendant's convictions that resulted from her guilty plea, and remanded for further proceedings, in a case in which the defendant argued that she was constructively denied her right to counsel.

The panel held that the district court abused its discretion by denying the defendant's requests to substitute counsel without conducting an adequate inquiry. The panel observed that (1) the defendant did everything in her power to alert the court to her belief that she was receiving inadequate assistance of counsel, and the district court never conducted any meaningful inquiry into her concerns about her counsel or their relationship; (2) the record reflects serious breakdowns in communication and trust; (3) the defendant's two motions to substitute counsel, and three attempts to argue that her attorney had not advised her on the plea, were all made in advance of her plea deadline and more than a month before trial; and (4) even if her motions could be considered untimely, the court's failure to conduct an adequate inquiry and the extent of the conflict outweigh any untimeliness.

Rejecting the government's argument that any concerns the defendant had about her counsel were remedied by meetings she had with him, the panel wrote that there is a substantial risk that the defendant agreed that she was

---

[**] This summary constitutes no part of the opinion of the court. It has been prepared by court staff for the convenience of the reader.

satisfied with her attorney's performance because the magistrate judge pressured her to accept the plea and she knew that she had to make that statement to enter the plea.

Concurring, Judge Kozinski wrote only to note that the judges below acted with what they believed to be the defendant's best interest at heart.

## COUNSEL

Michael J. Bresnehan (argued), Law Offices of Michael J. Bresnehan P.C., Tempe, Arizona, for Defendant-Appellant.

Keith E. Vercauteren (argued), Assistant United States Attorney; Krissa M. Lanham, Deputy Appellate Chief; United States Attorney's Office, Phoenix, Arizona; for Plaintiff-Appellee.

## OPINION

FRIEDLAND, Circuit Judge:

Guadalupe Velazquez seeks to vacate a guilty plea on the ground that she was constructively denied her right to counsel when the district court denied her motions to substitute counsel without conducting an adequate inquiry. We agree that the district court abused its discretion in denying Velazquez's motions and thus vacate the convictions that resulted from her plea.

## I. BACKGROUND

### A.

Guadalupe Velazquez was in her late teens and on a scholarship at Arizona State University when she began dating Hector Ortiz, Jr.  At some point, Ortiz and his father began running a drug-trafficking organization that shipped marijuana across the United States and laundered the proceeds.  Local police and federal agents compiled evidence against the organization, including photographs and videos of Velazquez dropping off marijuana shipments at UPS.  When police executed a search warrant on the home that Velazquez shared with Ortiz, they found guns, ammunition, and large quantities of marijuana.

Ortiz, his father, Velazquez, and nine other associates were indicted on various charges stemming from their participation in the organization.  District Judge Teilborg of the United States District Court for the District of Arizona presided over the resulting criminal proceedings.

### B.

Velazquez was initially represented by Craig Orent, a court-appointed attorney.  Orent moved to withdraw and to have new counsel appointed on the basis of irreconcilable conflict and a breakdown in communications.  Velazquez then filed a pro se motion requesting the removal of Orent, a hearing on that request, and the appointment of substitute counsel.  After a four-minute hearing in which the district court refused Velazquez's request to speak, the court granted counsel's motion to withdraw.  The court then appointed Kenneth Countryman to represent Velazquez.

## C.

Because the course of Velazquez's relationship with Countryman and the circumstances of her eventual guilty plea are central to her arguments on appeal, we recount both in detail.

In September 2013, Ortiz's counsel filed two motions to suppress wiretap evidence. On Velazquez's behalf, Countryman filed requests to join in each motion. On October 1, the court denied all motions to join another defendant's motion to suppress, but allowed the defendants to file their own suppression motions within five business days. Countryman missed that deadline. On November 8, in a motion to extend the deadline, Countryman stated that he "did not discover the Court's Order . . . until recently" because he had been in trial. He also filed a motion to suppress wiretap evidence and a motion to sever. Later that day, the court denied all three motions, and the Government offered Velazquez a plea agreement.

On November 18, 2013, Velazquez filed a pro se request for new counsel, arguing that Countryman's representation of her was "beset by failed communications and inexcusable inattentiveness." Specifically, she cited Countryman's failure to file timely pretrial motions despite multiple warnings of the deadline from the court and Velazquez herself, a breakdown in communications, and an unspecified conflict of interest. She also "respectfully request[ed the] Court hold a hearing and conduct [an] inquiry into" her claims. On November 19, a second superseding indictment was issued and Velazquez filed five pro se motions relating to discovery, trial timelines, and the court's jurisdiction.

On December 3, the district court held a six-minute hearing on the pro se motions. After listing the motions,

Judge Teilborg stated, "I have reviewed those motions and . . . they are denied . . . as lacking any merit whatsoever," and he adjourned the proceeding. The following exchange then occurred:

> The Defendant: Excuse me, sir. May I say something?
>
> The Court: I'm sorry?
>
> The Defendant: May I say something?
>
> The Court: What is it you wish to say?
>
> The Defendant: Did you – sorry. I need clarification. . . . So basically are you telling me that you denied all my motions outright, even the request to conduct an inquiry as to the conflict of interest with Mr. Ken Countryman?
>
> The Court: I have denied the motions, and I went through them one by one, so each of them has been denied.
>
> The Defendant: Okay. So I'm not – there's absolutely no way I can address the Court?
>
> The Court: I'm sorry?
>
> The Defendant: There's – Your Honor, I need – I – I – I need to make a record, Your Honor, I absolutely need to make a record of his failure of communications, the fact that I have a plea deadline today and he has failed

to communicate the plea with me. I mean, I have evidence upon evidence, I have recorded e-mails, calls, everything, Your Honor, that he has continuously failed me. We have not gone through any of the discovery. He's lied to the Court and told you that –

The Court: I considered everything that was in writing that you filed with the Court and ruled on them. All right?

The Defendant: So there's absolutely nothing we can do now, even though he has not met with me, he hasn't done anything.

The Court: As I said, I reviewed what you put in writing and have ruled on it.

The Defendant: Okay. May I ask another thing, Your Honor, please, so I can state this on the record? I have a deadline for my plea. Okay? Today. If he stays on my case, that plea expires at five o'clock. Mr. Ken Countryman has never met with me and told me anything about the plea, never, Your Honor, absolutely never.

The Court: I've taken up the only thing before the Court at this time, and he, as your counsel, I'm sure, will do what he is obligated to do.

The Defendant: But he hasn't done that, Your Honor.

The Court: Very well.

Following this hearing, it appears that the prosecution granted Velazquez an extension to respond to its proffered plea deal. On December 4, Velazquez appeared for arraignment on the second superseding indictment before Magistrate Judge Bade. As Countryman was stating his appearance, Velazquez interjected that she and Countryman were "at great odds," and explained that he had given Velazquez only a few minutes to review the indictment, did not know what her charges were, and had missed several deadlines. Judge Bade responded that she was not going to consider those issues because Judge Teilborg had already denied Velazquez's motions, including her motion to appoint new counsel. Judge Bade then told Velazquez that she could file another motion for new counsel with Judge Teilborg and rescheduled the arraignment.

In accordance with Judge Bade's suggestion, Velazquez filed another motion for new counsel on December 10 and requested an evidentiary hearing. She alleged that Countryman had not conducted any independent investigation of her case, had not given her access to the discovery, and could not answer basic questions about the charges against her. She claimed that he repeatedly fell out of contact for months at a time, met with her only in public places like restaurants, and lied to her about deadlines, when she needed to appear in court, and what motions he had filed. She asserted that he had filed confidential information without her permission. She further claimed that Countryman's paralegal—a disbarred attorney—"used tactics of intimidation, humiliation, and sexual harassment to scare her to not go to trial" and told her that he, not Countryman, would be the one to file motions on her behalf. Finally, she alleged that Countryman had not discussed her

plea offer with her because he said that he had been too busy to read it. She concluded that she would be committing perjury if she agreed as part of a plea that she had received effective representation.

### D.

On December 10, Velazquez appeared before then-Magistrate Judge Logan for her rescheduled arraignment. The tensions between Velazquez and Countryman were evident from the beginning of the hearing. After stating his appearance, Countryman said, "Your Honor, I met with my client about the indictment. . . . [B]ecause of the nature of our communications, I'm not inclined to waive a reading [of the indictment] . . . . [W]e've been unable to meet and communicate and have any kind of productive meeting, and the last meeting we had I terminated." When Velazquez tried to bring up her motion for new counsel, Judge Logan said:

> The first thing is Judge Teilborg, he's a senior judge in this building, and he's an Article III district judge, and he's a higher level judge than I am. I can't overrule what he's already done. If he's already listened or taken consideration of the situation as it relates to your representation of Mr. Countryman, and he's already ruled on the issue in terms of Mr. Countryman being the person that will represent you, you can talk for the next two hours, and there's no way for me to change anything.

Judge Logan then explained each of the charges. Velazquez indicated that she understood the charges but stated that her attorney did not. The judge disagreed: "He

understands the nature of your charges, and you certainly understand the nature of your charges now." Although Judge Logan observed, "it's pretty clear to me that you don't wish to plead guilty to anything in this case," he began to address the plea offer.

Velazquez interjected to raise concerns about her counsel. She explained that she had not yet reviewed the plea with Countryman. She also alerted Judge Logan that she had filed another motion to substitute counsel with Judge Teilborg and had attached supporting exhibits. She explained that she had recorded her last meeting with Countryman "because of our mistrust, because of the breakdown in relationship," and offered the recording as proof of her claims.

Judge Logan declined to review the exhibits or recording and instead began explaining that Velazquez would not have received a more favorable plea agreement with different counsel. He stated that a defense attorney "can't make the executive branch, the federal government, do anything." He added, "If I were standing next to you as a defense counsel, it wouldn't change anything that the U.S. Attorney's Office was willing to do." The judge went on:

> The Court: So there's a plea agreement here that I've received . . . . [W]hen I read through the indictment and I read the plea offer, I see a few things in here that really popped out. And there were agreements, you know, to basically dismiss . . . Counts 2, 3, 7, 9, 13, 14, 26, 27, 28, 29, which led me to believe that the United States Government was seeking to have you plead guilty to Count No. 1 and Count No. 10 of the second superseding indictment. What that told me is your lawyer

clearly had some kind of interaction with the United States Government because the United States Government could have been seeking a plea of guilt to everything that's in the indictment. Mr. Vercauteren, what's her exposure if she goes to trial and she's convicted of all of these counts?

Mr. Vercauteren [the Prosecutor]: She's looking at over 40 years, I would say, pretty easily, and that's I think, under the Guidelines, not statutorily. Statutorily she could be facing life imprisonment.

The Court: So she's facing natural life in prison if she's convicted statutorily. And, ma'am, you wouldn't receive natural life. But if the [G]overnment, because what's driving the indictment, you have the conspiracy, you have the possessions, the money laundering, it's a lot of time but not as much as the big chunks with the drug conspiracy. But you have some . . . counts involving the guns which push the numbers up pretty much. So without getting into the actual negotiations, I would assume – and correct me if I'm wrong – as part of trying to resolve this case, the [G]overnment has agreed not to go forward with the [gun] counts. Is that right?

Mr. Vercauteren: That's correct. Those are being dismissed as part of the agreement under Section 4A.

The Court: And, Mr. Vercauteren, I know you're not Judge Teilborg, but I'm pretty sure you have an idea if she pled guilty to this offense – And, Mr. Countryman, my recollection is your client doesn't have any criminal history; is that right?

Mr. Countryman: She has zero, Judge.

The Court: Okay.  So –

Mr. Countryman: She'd be – she should have zero points on her criminal history, category I.

The Defendant: I asked him what level I was at, and he couldn't tell me.  I asked him what is the total amount of the contraband they were alleging.  He couldn't tell me.  And I have that all recorded.

Mr. Countryman: Well, first of all, Judge, anytime somebody sits in front of you and puts a bag in front of you, you ought to know that they're surreptitiously recording you, so it comes as no surprise.  I would be shocked that she would submit that to the Court, given her behavior during that instance, but that's up to her.  I'm sure she probably deleted that section.

The Defendant: It's all there.

Mr. Countryman: I told her very clearly during that meeting that she was a level 26 to

start. We could not get into how far she'd go up and down because I'm not going to meet with somebody who's yelling at me.

\* \* \*

The Court: . . . Well, not every defendant and defense lawyer like each other. But I want to make sure that you understand something, and this is very, very important for you to understand. If you don't like your lawyer and if the Judge allows you to get another lawyer, it doesn't mean that your contract changes. This is a plea agreement that the executive branch is offering you. Okay.

The Defendant: I –

The Court: Ma'am, let me just finish. Mr. Vercauteren, I'm just going to ask you if she for some reason received another lawyer, does the plea offer get better?

Mr. Vercauteren: No.

The Court: Do you understand that?

The Defendant: Yes, Your Honor. But the thing here is it's not about us liking each other, if he likes me or I don't like him. The point is the record will show, Your Honor, that he did not do one thing for my case, absolutely not one thing. I mean, he defaulted, procedurally defaulted on timelines, on the pretrial motion timeline.

Over a month, I believe, that's how late he was. And with all due respect, Judge Teilborg, I mean I know he's –

* * *

The Court: The Article III district judge has already decided, whether you enter a plea of guilty or you go to trial, Mr. Countryman will be standing next to you. Okay? . . . I don't want you to feel pressured in any way, because you need to maintain your innocence. If you did nothing wrong and the marijuana in the house you never saw, the bundles in the bathroom, you never saw a single firearm, you never saw anything, you never did anything, the cameras were wrong, it wasn't you, whatever the situation may be, if you feel that you've done nothing wrong, maintain your innocence and go to trial if that's what's best for you and your family. I want to make sure that you . . . understand that the United States Government – it doesn't matter who's standing there – they've offered you a disposition that will give you an opportunity to enter a plea if you choose to.

The Defendant: Okay.

The Court: So the fact that Mr. Countryman didn't answer a question about the sentencing table, I can answer any question you need to know about a sentencing table. . . . But Mr. Countryman has been practicing law for a

long, long time. And, ma'am, the things that you allege can get a lawyer in a position where, you know, they may have some difficulty. So I don't know what happened between the two of you, and if you feel the need to file another motion with Judge Teilborg, I can't tell you what to do. . . . So, ma'am, you seem to think that if you can show me that Mr. Countryman is the bad guy in terms of he's not helping you, you get another lawyer or this whole thing goes away.

The Defendant: Your Honor, thank you for, you know, the information that you're sharing with me, but I'm not here asserting that if I get a different attorney, my plea will change. That's not what I'm here to say. . . . My issue here is that because of his right to effectively assist me or represent me, that's where it's been a conflict. How can, if he really doesn't know the case, how can he tell me or advise me on what's the best thing to do, whether it's to go to trial or to take the plea? My issue about going to trial is that I don't think that he's going to serve as an advocate for me, given his track record. Now, the thing about Mr. Ken Countryman right from the beginning, we did get along. . . . But getting along is one thing. Doing something on a case is another thing. And this goes back to, you know, the whole issue with him not doing anything for me. It's not saying like, oh, I don't like Mr. Ken

Countryman; he's not getting me a plea that I want. That's not it, Your Honor.

The Court: Okay. This is where I'm confused. How is it that you have – Mr. Vercauteren, this plea offer – I think I've asked before – does this offer get any better? If she had three retained lawyers and two CJA panel lawyers, does the offer from the United States Government get any better?

Mr. Vercauteren: No.

The Defendant: And I get that, Your Honor. But the thing is it's such a big range, right, from 5 to 40 years – and then it goes into . . . is my attorney going to effectively, you know, represent me and fight for me and make sure that I don't get that much time? That's what it all plays into. It's not about the plea and not being good enough. And then also, about the plea, I have to commit perjury. Everything else aside–I'm not going to comment on that–I'm only going to comment on the fact that I have to–

The Court: Ma'am, I can tell you right now I'm pretty confident that Mr. Countryman and Mr. Vercauteren aren't advocating for anyone to come in here and perjure themselves and commit a crime, an additional crime.

The Defendant: Okay. And I get that, but in the plea it –

The Court: No, no, no, you don't get that, because if you just placed on the record that, you know, you would have to commit perjury, I would love to hear about that. Who asked you to commit perjury?

The Defendant: No. Sorry. I misspoke. I'm sorry. I apologize. What I meant to say is that at the end of the plea, it says that I have to submit and say I have been . . . that "I am satisfied that my defense attorney has represented me in a competent manner," . . . I don't want – I'm scared to go to trial because I don't think that he's going to, you know, put a fight for me. Your Honor, he didn't submit any pretrial motions at all.

\* \* \*

The Court: . . . This is all I need to know from you, ma'am. You've been arraigned on the second superseding indictment. I've also informed you of your trial date. Do you wish to go forward with the change of plea hearing? Yes or no.

The Defendant: Do I have to have the clause in there about my attorney?

Mr. Vercauteren: Yes. You're asking me?

The Court: Yes, you do. Who are you asking?

The Defendant: Just – I don't know.

The Court: Well, you turned to Mr. Vercauteren. That's part of [Federal Rule of Criminal Procedure] 11, ma'am, because you have to be satisfied with the representation and understand the terms and conditions of your plea agreement. But in terms of satisfied with the representation, it doesn't mean – There's – In terms of competent representation, it doesn't mean that Mr. Countryman has to look at and touch every single aspect of the case. If Mr. Vercauteren reached out to Mr. Countryman and said, okay, count number one and count number ten, which happen to be what we're seeking your client's guilty plea on, here's the discovery information that directly relates to Count 1 and Count 10. If he reviews that, that's a diligent lawyer who's doing what he's supposed to be doing.

The court then held a sidebar with the attorneys and asked Vercauteren to recount his evidence against Velazquez and his negotiations with Countryman that led to omitting from the plea a gun charge that would have increased her sentence. Following that sidebar, the discussion in open court continued:

The Court: Ma'am, you have an opportunity. Mr. Vercauteren is standing right there in front of you. Is there anything you would like to ask of him?

The Defendant: Why is it the fact that even if I'm willing to take the plea, that clause about him, about my attorney? Why do I have to

submit to the fact that he competently, you know, advised me in the matter? . . .

The Court: Rule 11, there's certain things that must happen if a person says I wish to plead guilty.  As part of Rule 11, you have to believe that your lawyer is competent and has represented you properly.

The Defendant: Your Honor, I don't believe that, but at the same time I'm scared to go to trial with him because I don't think that he's going to do me justice.

The Court: Well, ma'am–and I'm not going to advocate in terms of what I believe you need to do, because that's not my role.  Only you can decide that.  But I'll tell you this.  If you have videotape and other co-defendants or whatever the evidence will show that says, yes, ladies and gentlemen, I'm sworn under oath, and yes, that lady in the video right there, that's Guadalupe Velazquez, and if the [G]overnment says do you see this woman in the courtroom, and the witnesses say, yeah, she's right there, whether they're agents, lay witnesses, co-accused, that's difficult evidence to get around.  You could be the best defense counsel ever, but if there's a videotape and people say yes, the woman with the box is Ms. Velazquez, and the box contains marijuana or the package contains cash money, and yes, that's her voice on the video audio, and she's talking about structuring cash amounts for deposit in an

FDIC bank, that's devastating.  But I'm not saying that you'll be convicted, but your lawyer's job is to make sure that you understand that if you take that risk and ultimately you're convicted, that's a lot of time. . . .

Mr. Countryman: And just for the record, Judge, I have advised her that if she doesn't take the plea, there will probably be more evidence against her that I haven't received yet.

The Court: Well, ma'am, the only thing I can say about that part is Mr. Vercauteren, he just stood up and said it's today or it's gone. There's no plea after today from what Mr. Vercauteren has said, so –

The Defendant: Is there any way, Your Honor, that my attorney and I could have a few days so we can, like, go over the plea?

The Court: What I can do – I can't give you – Well, the [G]overnment has already placed on the record that if the plea –

The Defendant: Can we ask him?

The Court: If the plea is not placed on the record today, they're withdrawing.  Is that correct, Mr. Vercauteren?

The Defendant: Please, can we just have –

Mr. Vercauteren: Judge, I've delayed this so often. . . . And so she's had this plea for a long time. It's time to make a decision. . . .

The Defendant: Well, see, Your Honor, the plea was forwarded to me November 8th. My attorney and me, we still haven't met. Like we haven't gone through, okay, what would be my corner if we were to go to trial? What are the witnesses that he would like to call? What can really hurt me? What can go against me? And talk about the pros and cons of the plea. That's the only thing that I'm asking for, Your Honor. I'm not trying to delay anything. Yes, it was forwarded to me on November 8th. Have I sat down with my attorney and have we really like, delved into it? No, we have not. So how can I competently sign something which I really don't know anything about because he hasn't advised me to it?

The Court: Mr. Countryman, I don't know how much of that is lacking, but if she hasn't had a chance to sit down with you and go through it –

Judge Logan then cleared the courtroom of the prosecutor and observers. Countryman reported that he had tried to advise Velazquez about her Guidelines level and the possibility of an exception to a mandatory minimum sentence. Countryman also raised mitigating arguments about Velazquez's education and work ethic, and Judge Logan responded that "Judge Teilborg would certainly listen

to" such arguments at the sentencing stage. The dialogue then continued:

>Mr. Countryman: And just for the record, I mean, everyone's agreed to enter a plea but Ms. Velazquez. And a lot of these defendants who filed these suppression motions entered pleas before that hearing because, in my opinion, they knew what the result of that was going to be. And if they went to hearing, they weren't going to have pleas. So I just want the record clear about that. However, I mean, she can do what she wants.
>
>The Defendant: And then –
>
>Mr. Countryman: She's smart. She has her own PACER account. She understands. And if she doesn't want to plead, I understand. But it's a lot of time she's looking at, and it's a lot of evidence.
>
>The Court: Go ahead, ma'am.
>
>The Defendant: Your Honor, we go back to – we just go back to the core of everything. We go back to the basis of, you know, I don't feel that Ken has tried to put any work into my case. . . . [W]e don't have any pretrial motions in, Your Honor, in respect to my case. I have given him leads upon leads upon leads that he never followed up with. . . . But at the end of the day, Your Honor, the only thing I'm asking is, again, I'm not trying to delay. It's just, like, I cannot make a decision

right now. I can't. I can't decide whether I'm going to sign the plea or go to trial. I just can't right now, Your Honor. I just can't.

* * *

Mr. Countryman: She needs to understand that Mr. Vercauteren's very serious about her and putting her on trial. He would have no problem with her getting 38 to 42 years, none whatsoever. The fact that I –

The Defendant: But what have you done to push back, Ken? What have you done to push back, with all due respect?

Mr. Countryman: . . . This is a mountain of evidence against her, and the motions that she wanted submitted, she filed them. The Judge denied them on the merits. She filed them pro se.

* * *

The Court: Ms. Velazquez, is there anything else you would like to tell me?

The Defendant: Your Honor, I just can't competently make a decision whether I want to waive the plea. I know that he's already said that. But I don't really want to go to trial because I'm scared, you know. And it is a lot of time to face.

> The Court: 40 years is a lot of time. You're correct. Five years is a lot of time. Any time is a lot of time.

> The Defendant: Any time is a lot of time, Your Honor. I just can't make the decision right now. I just can't. I don't want to say no to the plea. I just can't make the decision.

Velazquez then conferred with Countryman, who informed the judge that Velazquez wanted to take the plea agreement but needed more time to make her decision. The prosecutor agreed to give Velazquez one more day to review the agreement with her counsel. Judge Logan then adjourned the change of plea hearing until the next day.

Judge Logan reconvened the hearing on December 11. Without interruption, the judge proceeded with a standard plea colloquy, including reading the charges, explaining the plea agreement, explaining what rights Velazquez would waive by pleading guilty, and asking whether she understood. Toward the end of the hearing, Judge Logan raised the issue of Velazquez's satisfaction with her attorney.

> The Court: Ma'am, are you fully satisfied with all the assistance your lawyer Mr. Countryman's provided you?

> (The defendant and her counsel confer off the record.)

> Mr. Countryman: Just one moment, Judge.

> The Court: Of course.

(The defendant and her counsel confer off the record.)

The Court: Ma'am, is there anything else you would like to tell me?

Mr. Countryman: No, Judge, no, there's – We don't want to address this particular issue. I think the question the Court posited had to do with counsel, so if the Court could repeat that.

The Court: Of course. Mr. Countryman, your lawyer –

The Defendant: Yes.

The Court: – are you fully satisfied with all the assistance that he's provided you?

The Defendant: Yes.

The Court: And, ma'am, yesterday that wasn't the case. What's changed?

The Defendant: Well, he – Well, I'm going to, you know – extended my arm in good faith that even though –

The Court: You extended your arm?

The Defendant: I meant to say – I meant to say –

Mr. Countryman: I think she's trying to say we had a –

The Defendant: Tried to have a fresh start.

Mr. Countryman: Right. We had a meeting yesterday and today and –

The Defendant: Fresh start.

Mr. Countryman: – work together and move forward –

The Defendant: Yeah.

Mr. Countryman: – and try to get the best possible outcome at sentencing.

The Court: So you believe that the extra time that you had with Mr. Countryman allowed you to sit down with him, and it allowed Mr. Countryman to answer the questions you had about this document that you've had for a month?

The Defendant: Yes.

The Court: And he's answered all those questions?

The Defendant: Yes.

The Court: So you're fully satisfied with all the assistance he's provided you in your case?

The Defendant: Yes, yes.

The plea agreement contained a waiver of the right to appeal. Judge Logan confirmed during the hearing that Velazquez understood the appeal-waiver section and that she did not have any questions about it.

**E.**

On December 13, 2013, without holding any hearing, Judge Teilborg denied Velazquez's December 10 motion for new counsel as moot or, in the alternative, on the merits. The order stated that the court had reviewed her motion and her testimony at the change-of-plea proceeding, "at which she admitted she is fully satisfied with all the assistance she has received from her counsel." On January 2, 2014, the district court adopted Judge Logan's recommendation to accept Velazquez's guilty plea.

On March 14, 2014, Juan Rocha, an attorney Velazquez retained, substituted in for Countryman. At the sentencing hearing in June, after asking Velazquez "Have you been satisfied with your lawyer" and receiving the response "yes," Judge Teilborg imposed a sentence of 121 months. Rocha did not at any point try to withdraw Velazquez's guilty plea.

## II. STANDARDS OF REVIEW

We review *de novo* the validity of an appeal waiver. *United States v. Portillo-Cano*, 192 F.3d 1246, 1249 (9th Cir. 1999). We review a denial of a motion for substitution of counsel for abuse of discretion. *United States v. Reyes-Bosque*, 596 F.3d 1017, 1033 (9th Cir. 2010).

## III. DISCUSSION

### A.

To begin, the Government contends that we should dismiss Velazquez's appeal without reaching the merits because she waived her right to appeal as part of the plea agreement. We decline to do so.

"[W]aivers of appeal must 'stand or fall with the agreement of which they are a part.'" *United States v. Portillo-Cano*, 192 F.3d 1246, 1250 (9th Cir. 1999) (quoting *United States v. Wenger*, 58 F.3d 280, 282 (7th Cir. 1995)). In *Portillo-Cano*, the defendant challenged "the soundness of his plea allocution under Rule 11," which provides the procedure for accepting pleas in criminal cases. *Id.* We explained that such an error "goes to the heart of whether his guilty plea, including the waiver of appeal, is enforceable." *Id.* As a result, we concluded that "we must determine whether the plea was valid in order to determine if appeal is permitted." *Id.* Here, Velazquez asserts that Judge Teilborg's denials of her motions to substitute counsel constructively denied her the right to counsel, and she also challenges Judge Logan's compliance with Rule 11. Because, as explained below, we agree that she was constructively denied counsel, we hold that her appeal waiver is unenforceable.

### B.

"Where a criminal defendant has, with legitimate reason, completely lost trust in his attorney, and the trial court refuses to remove the attorney, the defendant is constructively denied counsel." *Daniels v. Woodford*, 428 F.3d 1181, 1198 (9th Cir. 2005) (citing *United States v. Adelzo-Gonzalez,* 268 F.3d 772, 779 (9th Cir. 2001)). "A

defendant need not show prejudice when the breakdown of a relationship between attorney and client from irreconcilable differences results in the complete denial of counsel." *United States v. Moore*, 159 F.3d 1154, 1158 (9th Cir. 1998); *see also Perry v. Leeke*, 488 U.S. 272, 280 (1989) ("'[A]ctual or constructive denial of the assistance of counsel altogether' is not subject to . . . prejudice analysis." (quoting *Strickland v. Washington*, 466 U.S. 668, 692 (1984))). Because the Sixth Amendment's guarantee of effective assistance of counsel applies at the plea-bargaining stage, *Missouri v. Frye*, 566 U.S. 133, 143–44 (2012), constructive denial of counsel can occur at that phase just as it can at trial. *See Appel v. Horn*, 250 F.3d 203, 212 (3d Cir. 2001).

To evaluate whether a district court abused its discretion in denying a motion to substitute counsel, we consider three factors: "(1) the adequacy of the district court's inquiry; (2) the extent of the conflict between the defendant and counsel; and (3) the timeliness of defendant's motion." *United States v. Reyes-Bosque*, 596 F.3d 1017, 1033 (9th Cir. 2010).

## 1.

With respect to the adequacy of the district court's inquiry, the Supreme Court has emphasized that, in most cases, "courts cannot properly resolve substitution motions without probing why a defendant wants a new lawyer." *Martel v. Clair*, 565 U.S. 648, 664 (2012); *see also United States v. Musa*, 220 F.3d 1096, 1102 (9th Cir. 2000) (finding error where the district court "made no inquiry at all" into the request to substitute); *United States v. Gonzalez*, 113 F.3d 1026, 1028–29 (9th Cir. 1997) (holding that the trial court abused its discretion by refusing to hold an evidentiary hearing on the motion to substitute). Failure to

conduct an inquiry is not necessarily an abuse of discretion if the trial court has sufficient information to resolve the motion. *See Martel*, 565 U.S. at 664–66; *United States v. Smith*, 282 F.3d 758, 764–65 (9th Cir. 2002); *United States v. McClendon*, 782 F.2d 785, 789 (9th Cir. 1986). Even so, "[t]here is no question that our case law favors an inquiry when a party seeks substitute counsel." *Smith*, 282 F.3d at 764.

We have held that, "[w]hen a trial court is informed of a conflict between trial counsel and a defendant, 'the trial court should question the attorney or defendant privately and in depth, and examine available witnesses.'" *Daniels*, 428 F.3d at 1200 (quoting *United States v. Nguyen,* 262 F.3d 998, 1004 (9th Cir. 2001)). In *Adelzo-Gonzalez*, for example, the district court denied motions to substitute counsel despite obvious antagonism between the attorney and defendant. 268 F.3d at 777–78. We held that the district court had failed to conduct an adequate inquiry into the attorney-client relationship and put "too much emphasis on the appointed counsel's ability to provide adequate representation." *Id.* at 778. Similarly, in *Moore,* the parties alerted the court to a conflict on three occasions before the court conducted any inquiry. 159 F.3d at 1160. When the court finally inquired, it gave both parties a chance to speak, but "made no inquiries to help it understand the extent of the breakdown." *Id.* We found that this inquiry was inadequate and that, as a result, the court had failed to identify the irreconcilable conflict between the defendant and his attorney. *Id.* at 1160–61.

In cases in which we have held that the adequacy-of-inquiry factor was satisfied, the district court typically held at least one hearing during which it asked specific questions. *See Reyes-Bosque*, 596 F.3d at 1034; *United States v.*

*Mendez-Sanchez*, 563 F.3d 935, 943–44 (9th Cir. 2009); *United States v. McKenna*, 327 F.3d 830, 843–44 (9th Cir. 2003); *Smith*, 282 F.3d at 763; *United States v. Corona-Garcia*, 210 F.3d 973, 977 (9th Cir. 2000).

Here, Velazquez clearly and consistently raised concerns about her representation, and the district court's response was clearly and consistently insufficient. Judge Teilborg summarily denied Velazquez's first motion to replace Countryman. When Velazquez tried to present supporting evidence and to argue the motion in court on December 3, he refused to consider anything beyond Velazquez's pro se written motion. Velazquez said that her plea deadline was that day and that her attorney had not yet met with her about it. Judge Teilborg replied that Countryman "will do what he is obligated to do." When Velazquez responded that Countryman "hasn't done that," the judge merely replied, "[v]ery well," and concluded the exchange.

On December 10, Velazquez filed her second pro se motion for new counsel and requested "an evidentiary hearing before the Court." As described above, this motion detailed a serious breakdown in the attorney-client relationship as well as claims of intimidation and harassment. It also attached supporting exhibits, including emails documenting Countryman's failures to respond to her inquiries.

On December 13, Judge Teilborg denied the December 10 motion for new counsel as moot or, in the alternative, on the merits. He held no hearing and made no inquiry into Velazquez's allegations. Instead, he relied on her testimony at the December 11 change-of-plea proceeding, "at which she admitted she is fully satisfied with all the assistance she has received from her counsel."

Velazquez did everything in her power to alert the court to her belief that she was receiving inadequate assistance of counsel. She filed two motions and supporting exhibits, raised her concerns before three judges at three different hearings, and was dogged in placing her concerns on the record. Despite all of this, the district court never conducted any meaningful inquiry into Velazquez's concerns about her counsel or their relationship.

Because Velazquez previously replaced an attorney based in part on a breakdown in communications, the district court, upon seeing her motion to replace Countryman, might have assumed that the conflicts stemmed from unreasonableness on Velazquez's part. *See Mendez-Sanchez*, 563 F.3d at 944. But our precedent required at least an inquiry into the relationship between Velazquez and Countryman. *See, e.g.*, *Smith*, 282 F.3d at 764. Given the specific, serious allegations that Velazquez had made about her counsel, the district court's lack of any inquiry at all, let alone a "meaningful attempt to probe more deeply into the nature" of the attorney-client relationship, *Adelzo-Gonzalez*, 268 F.3d at 778, left Velazquez's right to counsel in jeopardy. The "adequacy of the district court's inquiry" factor thus weighs in favor of finding an abuse of discretion. *Reyes-Bosque*, 596 F.3d at 1033.

**2.**

The second factor we consider is the extent of the conflict between the attorney and client. *See id.* We ask whether "there was a serious breach of trust and a significant breakdown in communication that substantially interfered with the attorney-client relationship." *Adelzo-Gonzalez*, 268 F.3d at 779.

In situations similar to the one presented here, we have held that the extent of the conflict warranted granting substitution of counsel.  In *United States v. Williams*, 594 F.2d 1258 (9th Cir. 1979) (per curiam), for example, we held that the district court abused its discretion when it denied substitution of counsel despite strong evidence of irreconcilable conflict between counsel and the defendant. *Id.* at 1261.  There, it was "clear from the transcript that client and attorney were at serious odds and had been for some time."  *Id.* at 1259.  Moreover, the defendant's allegations of a lack of communication were unrefuted and "the response of counsel tended to confirm that the course of the client-attorney relationship had been a stormy one with quarrels, bad language, threats, and counter-threats."  *Id.* at 1260.  In *Adelzo-Gonzalez*, we likewise found an extensive conflict where, among other things, the attorney threatened to testify against his client, "virtually abandoned his representation of [the client] with respect to the motions to substitute counsel," and left him "to make the motions by himself, while the appointed counsel took an adversary and antagonistic stance."  268 F.3d at 779.

The record here reflects serious breakdowns in communication and trust.  Before Judge Teilborg on December 3, Velazquez asserted that her attorney had not advised her on her plea deal, even though the offer was set to expire that day.  Her December 10 motion before the district court contained multiple specific, troubling allegations of a breakdown in communications, a failure to independently investigate the case, lies about deadlines and filings, and intimidation and harassment.

The transcript of the hearing on December 10 is also replete with evidence of a dysfunctional attorney-client

relationship.[1]    Countryman began the December 10
arraignment by reporting problems communicating with his
client.  Velazquez described recording their conversations
out of a lack of trust; Countryman admitted to cutting
meetings short because Velazquez yelled at him; they openly
bickered in court.  Countryman did not help Velazquez
present her motions to substitute counsel.  At times he
actually argued against her position by trying to convince the
magistrate judge that he had adequately advised her.  He also
made gratuitous statements about there being a mountain of
evidence against her and the fact that the prosecutor would
have "no problem with her getting 38 to 42 years, none
whatsoever."

There was evidence that a "significant breakdown" in the
attorney-client relationship had occurred.  As a result, the
"extent of the conflict" factor also weighs in favor of finding
an abuse of discretion.

### 3.

The third factor we evaluate is the timeliness of the
defendant's request to substitute counsel.  *Reyes-Bosque*,
596 F.3d at 1033.  In this inquiry, the court "balance[s] 'the
resulting inconvenience and delay against the defendant's

---

[1] We recognize that Judge Teilborg did not preside over the
December 10 hearing.  In his order denying Velazquez's December 10
motion to substitute counsel, however, he cited her testimony at the
December 11 change-of-plea hearing as support for the denial.  In the
same passage of the December 11 transcript that Judge Teilborg cited,
the magistrate judge referred to the fact that Velazquez had said on
December 10 that she was not satisfied with her counsel, and Velazquez
and Countryman described having tried during meetings on December
10 and 11 to have a fresh start.  These statements should have alerted
Judge Teilborg that the December 10 hearing contained information
relevant to ruling on the substitution motion.

important constitutional right.'" *Moore*, 159 F.3d at 1161 (quoting *United States v. D'Amore*, 56 F.3d 1202, 1206 (9th Cir. 1995), *overruled on other grounds by United States v. Garrett*, 179 F.3d 1143 (9th Cir. 1999)). This factor must always be evaluated in the context of the litigation in question, so no precise amount of advance notice is required to render a request timely. *Compare, e.g.*, *Moore*, 159 F.3d at 1161 (holding that attempts to substitute counsel one month before trial and then again two weeks before trial were timely even when they would have required continuances), *and D'Amore*, 56 F.3d at 1206 (holding that an attempt to contact the court ten days before a hearing and a motion one day before the hearing were timely), *with Mendez-Sanchez*, 563 F.3d at 942 (holding that a motion two weeks before a trial was not timely because trial had already been continued twice, "involved significant discovery," and would have required a further continuance). This is in part because "sometimes a defendant would be unable to make a motion until shortly before trial—such as in a case where a defendant realized his or her counsel was not prepared." *Mendez-Sanchez*, 563 F.3d at 942.

Here, Velazquez filed her first motion to substitute counsel ten days after it became clear that Countryman had defaulted on the pretrial-motion deadline. In the week before her plea deadline, she filed another motion and made three attempts to argue in court that Countryman had not advised her on the plea. She made all of these efforts more than a month before the trial.

Although this was a complex case with voluminous discovery that might have required a continuance if new counsel were appointed, Velazquez filed her motions promptly. The third factor thus also favors holding that the district court abused its discretion.

**4.**

Even if her motions could be considered untimely—a reason the district court never relied on in its rulings on the motions to substitute—the court's failure to conduct an adequate inquiry and the extent of the conflict outweigh any untimeliness in the balance of factors.  Taken together, the factors weigh in favor of finding an abuse of discretion.  We thus conclude that the district court abused its discretion by denying Velazquez's requests to substitute counsel without conducting an adequate inquiry.   The result was a constructive denial of counsel that requires us to vacate Velazquez's guilty plea.[2]   *See Perry*, 488 U.S. at 280; *Moore*, 159 F.3d at 1158.

**C.**

The Government argues against this result, asserting that any concerns Velazquez had about her counsel were remedied by meetings she had with him on December 10 and 11.  The Government points out that Velazquez stated during the December 11 change-of-plea hearing that she had resolved the problems with her counsel during those meetings.  Even if meetings the day before a plea hearing could  potentially  remedy  serious  and  longstanding

---

[2] In contrast to *Musa*, in which there was no record on the nature of conflict, 220 F.3d at 1099, 1102–03, here we have substantial information regarding Velazquez's concerns about her counsel.  As a result, unlike in *Musa*, it is unnecessary for us to remand for a further inquiry into Velazquez's concerns before deciding whether her guilty plea should be vacated.  In any event, the Government has not argued that vacatur of the plea is inappropriate if Velazquez succeeds on her substitution-of-counsel claim, and any argument to that effect is therefore waived.

breakdowns in an attorney-client relationship in a complicated case—a question we need not decide—we do not believe that Velazquez's statements at the December 11 hearing are a reliable indication that productive meetings between Velazquez and her counsel had occurred.  As explained below, we think it is likely that her statements instead were caused by the magistrate judge's discussion of the plea the day before.[3]  *See United States v. Anderson*, 993 F.2d 1435, 1438 (9th Cir. 1993) (explaining that when a judge improperly participates in a plea negotiation, the defendant's "responses to the judge's questioning during the formalistic colloquy do not allay our concerns regarding voluntariness"), *abrogated on other grounds by United States v. Davila*, 133 S. Ct. 2139 (2013).

Federal Rule of Criminal Procedure 11(c)(1) prohibits any participation by a judge in plea negotiations. *See United States v. Bruce*, 976 F.2d 552, 555–56 (9th Cir. 1992), *abrogated on other grounds by Davila*, 133 S. Ct. 2139. This includes magistrate judges even when they are neither "the sentencing judge nor the judge presiding over the defendant's criminal case." *United States v. Myers*, 804 F.3d 1246, 1253 (9th Cir. 2015).  One of the reasons for Rule 11's ban on judicial participation in plea discussions is to avoid the "high and unacceptable risk of coercing a defendant to accept the proposed agreement and plead guilty." *Bruce*, 976 F.2d at 556.

---

[3] Because we have concluded that Velazquez's plea must be vacated on Sixth Amendment constructive-denial-of-counsel grounds, we need not address the Government's arguments that any Rule 11 violation is subject to plain error review, and that Velazquez has failed to show sufficient prejudice to meet that standard.  We address Rule 11 only to respond to the Government's argument that her statements on December 11 indicated that the constructive denial of counsel had been remedied.

In *Bruce*, for example, we were concerned that the judge's involvement, even though well-intentioned, carried an undue risk of coercion. *Id.* at 556, 558. In that case, the judge asked the prosecutor to summarize the plea offer and state the range of possible sentences based on the charges. *Id.* at 555. After confirming that the defendants understood they were facing a possible life sentence if they proceeded to trial, the judge asked them, "You don't want to think about that some more, the two of you?" *Id.* He continued, "I would think seriously about it, both of you. Life in prison is a long time. It is really nothing to play with." *Id.* We observed that the judge's comments made "unambiguously clear [his] preference that the defendants accept the plea bargain and plead guilty," despite the fact that the judge never explicitly advised the defendants to do so. *Id.* at 556 n.2. We emphasized that any judicial involvement in plea discussions carries an "unacceptably high risk of coercion." *Id.* at 556.

It is this risk that leads us to treat Velazquez's statements at the December 11 hearing as unreliable. Even after explicitly recognizing that Velazquez was disinclined to plead guilty, Judge Logan proceeded for over an hour to effectively urge acceptance of the plea deal. He repeatedly asserted that the Government would not change the terms of its offer if Velazquez received a new lawyer. He elicited comments from the prosecutor on the deal's advantages. He emphasized that Judge Teilborg had already decided that Countryman would be her attorney should she go to trial and tried to assuage her concerns about his performance. Judge Logan speculated that the evidence against her at trial could be "devastating," but that, if she pleaded guilty, Judge Teilborg would be receptive to arguments that would shorten her sentence. And, finally, when Velazquez asked why the plea agreement required her to agree that she was satisfied

with her attorney, Judge Logan answered that Rule 11 required it.[4] Although Judge Logan periodically stated that he was not interfering with the parties' negotiations or advising Velazquez what to do, the full picture that Velazquez must have taken away from the December 10 hearing is apparent: the only way to avoid facing a mountain of devastating evidence at trial with an attorney she did not trust was to plead guilty, and to plead guilty she must attest that she was satisfied with her attorney.[5]

As a result, Velazquez's two meetings with her attorney after the December 10 hearing and her "responses to the judge's questioning during the formalistic colloquy" on December 11 affirming her satisfaction with her attorney "do not allay our concerns." *See Anderson*, 993 F.2d at 1438. We conclude that there is a substantial risk that Velazquez agreed that she was satisfied with her attorney's performance because the magistrate judge pressured her to accept the plea and she knew that she had to make that statement to enter the plea. Her December 11 statement thus does not undermine

---

[4] Of course, we do not fault the magistrate judge for accurately responding to Velazquez's question about Rule 11. We include this because it is an important part of the message that Velazquez received.

[5] The Government suggests that the fact that a day passed between the December 10 hearing and her December 11 plea allowed any coercion to dissipate. We disagree. *See United States v. Sanya*, 774 F.3d 812, 818, 822 (4th Cir. 2014) (finding a Rule 11 violation where plea changed five days after Rule 11 violation); *Anderson*, 993 F.2d at 1438–39 (finding a Rule 11 violation where plea changed two days after violation); *Bruce*, 976 F.2d at 554–56 (finding a Rule 11 violation where plea changed day after violation).

our conclusion that the denial of Velazquez's motion to substitute counsel was an abuse of discretion.[6]

## IV. CONCLUSION

For the foregoing reasons, we **VACATE** Velazquez's convictions and **REMAND** for further proceedings.

---

KOZINSKI, Circuit Judge, concurring:

I join Judge Friedland's thorough opinion without reservation. I write only to note that the judges below acted with what they believed to be Velazquez's best interest at heart. Even now, withdrawing from the plea may not be wise, but it's Velazquez's choice to make. I hope and trust that the government will accept her choice with generosity and compassion.

---

[6] The transcript of the hearing on December 11 and Velazquez's actions after it serve only to strengthen this assessment. On December 11, when Judge Logan asked whether Velazquez was satisfied with her attorney, she hesitated to respond. She and Countryman conferred off the record. He then said, "We don't want to address this particular issue." When the judge asked her again, Velazquez said she was satisfied. But only two months later, a privately retained attorney substituted in for Countryman. Taken together, these facts suggest that Velazquez was not, in fact, satisfied with Countryman's performance.